FIRST OF AMERICA BANK-ILLINOIS, N.A., f/k/a First of America Bank-Springfield, N.A., Plaintiff-Appellant, v. NICHOLAS D. DRUM, Indiv. and d/b/a Springfield Coachwerks, Defendant (Stephen G. Vincent, Defendant-Appellee).

Fourth District   No. 4—97—0575

Argued December 17, 1997.—Opinion filed February 9, 1998.

Stephen C. Ferlmann and Jeffrey G. Sorenson (argued), both of Howard & Howard Attorneys, P.C., of Peoria, for appellant.

James R. Enlow (argued), of Scott & Scott, P.C., of Springfield, for appellee.

JUSTICE COOK delivered the opinion of the court:

The trial court denied both parties' motions for summary judgment but made the necessary findings for an interlocutory appeal under Supreme Court Rule 308. 155 Ill. 2d R. 308. We answer the question of law identified by the trial court and remand for further proceedings.

For several years plaintiff First of America Bank-Illinois, N.A. (Bank), extended a line of credit to defendants Nicholas D. Drum and

Stephen G. Vincent. The most recent documents executed by the parties were a letter and promissory note dated April 1, 1994, and executed May 27, 1994. The letter referred to a commitment, in the amount of $175,000, for a term of one year. The note was in the amount of $175,000, due April 1, 1995, with interest payable on the first day of each month. The note recited that it evidenced a line of credit, that payments on principal could be made from time to time, that the Bank could subsequently readvance said funds up to the full principal amount of the note, and that separate notes would not be executed for such advances but, rather, the advances and payments would be recorded in a loan account. The note provided that "advances hereunder shall at all times be made at the sole discretion of the Bank, and Bank shall not have any obligation whatsoever to make any such advances."

Drum operated a used-car business. He had a floor plan line of credit with the Bank since June 26, 1992. On April 1, 1993, Vincent, whom the Bank describes as a "customer of Drum," agreed to cosign a renewal note increasing the line of credit from $30,000 to $100,000. The various letters and notes describe Vincent as a "borrower," but some bank records refer to him as a "guarantor." The line of credit was again increased, to $130,000, in August 1993. The most recent letter and note, described above, were executed May 27, 1994.

On April 1, 1995, the note matured, with a principal amount owing of $169,000. The Bank did not call the note but continued to allow Drum to access the line of credit until January 18, 1996, while the Bank attempted to negotiate a renewal of the note. The cumulative amount of Drum's draws, postmaturity, was approximately $260,000, but Drum was making payments on principal during that time and, accordingly, the amount of credit extended at any one time was never greater than $175,000. The present record, interestingly enough, indicates that there were no conversations between the Bank and Vincent during the April 1, 1995, to January 18, 1996, time period. According to Vincent, the Bank's April 26, 1995, floor plan audit revealed there were nine missing cars, and Drum refused to provide financial statements after that time. On January 18, 1996, after another floor plan audit, Drum admitted to the Bank that he had sold cars out of trust, and the Bank called the note, set off Drum's deposit accounts, and seized and liquidated the collateral. After setoff and liquidation, the principal amount was reduced to $98,801.71. Drum subsequently filed for bankruptcy.

■ As a preliminary matter we review the law of suretyship defenses under section 3—605 of the Uniform Commercial Code—Negotiable Instruments. 810 ILCS 5/3—605 (West 1996); see also 2 J.

White & R. Summers, Uniform Commercial Code § 16—10, at 105-06 (4th ed. 1995) (discussing suretyship defenses). As between the surety and the debtor, it is clear that the debtor has the primary obligation to pay the debt. If the creditor releases the principal debtor without insisting on full payment (section 3—605(b)) or extends the due date of the note (section 3—605(c)) or otherwise materially modifies the obligation (section 3—605(d)) or impairs the collateral (section 3—605(e)), the surety's burden may be increased. The law has traditionally held that conduct by the creditor that increases the surety's risk discharges the surety or reduces the surety's obligation *pro rata*.

Some conduct by the creditor, however, may actually leave the surety better off. White & Summers give the example of the creditor who grants an extension because the debtor, who honestly hopes to pay the debt, needs an extra week to gather the money. See 2 J. White & R. Summers, Uniform Commercial Code § 16—11, at 116 (4th ed. 1995). It may be reasonable to chance future voluntary payment over immediate forced collection. For this reason the Uniform Commercial Code allows suretyship defenses to be waived by language in the note. That language may be either specific or general. 810 ILCS 5/3—605(i) (West 1996). Of course, any extension, indulgence or release must be done in good faith. See 2 J. White & R. Summers, Uniform Commercial Code § 16—11, at 115-19 (4th ed. 1995). The surety may also consent to the conduct of the creditor, which makes it important to know whether there were any conversations in this case between Vincent and the Bank or between Vincent and Drum. 810 ILCS 5/3—605(i) (West 1996).

■ Vincent argues that he is an accommodation maker or guarantor and accordingly is entitled to suretyship defenses. Vincent first argues that when the Bank extended the due date of the note it violated his rights under section 3—605(c) and he is accordingly discharged. That argument must be rejected, as there is language in the note waiving that defense. We quote that language later in this opinion. Vincent also argues that the Bank's conduct in this case constitutes other material modification of the obligation under section 3—605(d). Under that section, Vincent would be entitled to discharge to the extent the modification caused him loss and the burden of proof would be on the Bank to show that no loss was caused. 810 ILCS 5/3—605(d) (West 1996).

Vincent finally argues that even if he were merely a comaker of the note, jointly and severally obligated for its payment, (1) he was only obliged to pay the instrument "according to its terms at the time it was issued" (810 ILCS 5/3—412 (West 1996)), (2) the Bank's ac-

tions in continuing to advance funds after the note had matured materially altered his obligations, and (3) he is accordingly discharged. Certainly this line-of-credit note anticipated there would be advances after it was "issued" (April 1, 1994), but it is not clear there could be advances after the note matured (April 1, 1995). Even a party who is not an accommodation maker, one who is jointly and severally liable as a comaker, is discharged when a person entitled to enforce the instrument impairs the value of the interest in collateral, to the extent the impairment causes the comaker to pay more than the comaker would have been obliged to pay, taking into account rights of contribution from other comakers. The burden of proving such impairment is on the party asserting discharge. 810 ILCS 5/3—605(f) (West 1996).

The Bank did more in this case than extend the due date of the note. The Bank advanced new money after the note matured, for which the Bank claims that Vincent is liable. Both section 3—605(c) and section 3—605(d) provide for discharge only to the extent the extension or modification caused loss, and it is not clear that any loss has been caused to Vincent. The additional advances resulted in the acquisition of additional collateral. It may be Vincent's claim that payments must be applied first to advances made before the note matured, even if those payments were derived from postmaturity advances. It hardly seems fair, however, for Vincent to receive the benefits of postmaturity advances while disclaiming any of the burdens. Likewise the Bank may not be entitled to place collection of its postmaturity advances, for which Vincent may not be liable, ahead of advances for which Vincent is liable. See 2 J. White & R. Summers, Uniform Commercial Code § 16—11, at 122 (4th ed. 1995).

■ The Bank, citing the language from the note quoted above, argues that under the terms of the note it was entitled, not just to refrain from calling the note, but also to make additional advances on the note after it had matured. The question of law identified by the trial court, pursuant to Rule 308, was:

> "Whether Vincent by executing the Note, which contains the following provision:
>
>> The Borrower hereby waives presentment, demand, protest, notice of dishonor and agrees that each Borrower, if more than one, shall not be released or discharged by reason of any extension, indulgence, or a release given to any person, or by the Bank's release, sale or nonaction with respect to the Collateral or any guarantee or other undertaking securing this Note.
>
> authorized the Bank to extend additional credit to Drum after the maturity date of the Note."

We answer that question in the negative. The quoted language is common language found in almost all notes, both single-advance notes and line-of-credit notes. The purpose of the quoted language is to limit or eliminate suretyship defenses, as authorized by section 3—605(i). 810 ILCS 5/3—605(i) (West 1996). As discussed above, the particular suretyship defense addressed by the word "extension" is the defense created by "an extension of the *due date.*" (Emphasis added.) 810 ILCS 5/3—605(c) (West 1996). Section 3—605 seems to have been written in terms of single-advance notes, not the line-of-credit note involved here. The Bank argues that if the due date is extended, all the provisions of the note must be extended, and the provisions of this note allowed the Bank to make additional advances while the note was in existence. The Bank's argument would negate clear language in this letter and note that the line of credit had a term of only one year. See also 810 ILCS 5/5—106(c) (West 1996) (a letter of credit expires one year after its stated date of issuance). If the Bank's argument is correct, it was never necessary for it to renew a line-of-credit note, although it was clear the Bank regularly did so, had done so before in this case, and was attempting to do so with this note before the Bank decided to call it. The Bank agrees that it was not bound to advance new money after the note matured here. It is incongruous for the Bank to argue that Vincent on the other hand had to accept the making of advances in perpetuity. If that was the Bank's intention, it should have included specific language in the note to accomplish that purpose.

The Bank cites *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944 (Mo. App. 1986). *Shaughnessy,* however, did not involve a comaker or guarantor, and the only issue there was whether the lender was required to make advances under an irrevocable line of credit after the original note had been extended. The decision states that the original note was "unilaterally" extended by the lender, but the decision quotes from a document by which "the parties hereby agree to extend and modify the Note so that it comes due On February 16, 1981." (Emphasis omitted.) *Shaughnessy,* 715 S.W.2d at 950. The dispute in *Shaughnessy* was not over whether the extended note contained all the provisions of the original note, but whether the original note was a demand note. The Bank also cites *American National Bank v. Warner,* 127 Ill. App. 3d 203, 468 N.E.2d 184 (1984). In *American National,* however, there was no line of credit and there was no advance of new money after the original note matured, only renewal notes signed by one of the comakers. *American National* supports the proposition that language similar to ours is intended to waive suretyship defenses as allowed by section 3—605(i), specifically

the defense of "extension of the due date" described in section 3—605(c). 810 ILCS 5/3—605(c), (i) (West 1996).

■ Trial courts are not allowed to send questions to the appellate court whenever they feel the need to do so. Rule 308 applies only when the trial court makes an interlocutory order not otherwise appealable. When the trial court identifies a question of law under Rule 308, the appeal is from the interlocutory order. When the appellate court, in its discretion, allows an appeal under Rule 308, the court is not limited to answering the questions that the trial court has identified. Instead the appellate court may " 'enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief *** that the case may require.' " *Schrock v. Shoemaker*, 159 Ill. 2d 533, 537, 640 N.E.2d 937, 939 (1994), quoting Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)); see also *Kerker v. Elbert*, 261 Ill. App. 3d 924, 925, 634 N.E.2d 482, 483 (1994); *Schoonover v. American Family Insurance Co.*, 214 Ill. App. 3d 33, 40-41, 572 N.E.2d 1258, 1262-63 (1991); *Billerbeck v. Caterpillar Tractor Co.*, 292 Ill. App. 3d 350, 356-57, 685 N.E.2d 1018, 1022-23 (1997) (discussing *Schrock* and scope of Rule 308 review). Nevertheless, we must be cautious, in taking actions not taken by the trial court, that we do not deprive the parties of the opportunity to show the error of those actions. *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 155 Ill. 2d 223, 230, 613 N.E.2d 702, 705 (1993). In this case summary judgment is not appropriate, at least not at the present time, because questions of fact exist, including whether the postmaturity advances prejudiced the rights of Vincent.

We do not suggest that the Bank acted improperly in making the postmaturity advances. We hold only that the Bank is not entitled to look to Vincent for the repayment of those advances. We answer the certified question in the negative and remand the case.

Question answered; cause remanded.

GREEN and McCULLOUGH, JJ., concur.